IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **FELICIA MARIE BUCHANAN-ADAIR,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 12-CV-160-PJC** |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of the** | ) | |
| **Social Security Administration,**[1] | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Claimant, Felicia Marie Buchanan-Adair ("Buchanan-Adair"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying her applications for disability insurance benefits and supplemental security income benefits under the Social Security Act, 42 U.S.C. §§ 401 *et seq*. In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. Any appeal of this order will be directly to the Tenth Circuit Court of Appeals. Buchanan-Adair appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Buchanan-Adair was not disabled. For the reasons discussed below, the Court **AFFIRMS** the Commissioner's decision.

---

[1] Pursuant to Fed. R. Civ. P. 25(d)(1), Carolyn W. Colvin, the current Acting Commissioner of the Social Security Administration, is substituted for Michael J. Astrue as Defendant in this action. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

**Claimant's Background**

Buchanan-Adair was 47 years old at the time of the hearing before the ALJ on April 19, 2010.  (R. 25, 30).  Buchanan-Adair testified that she completed tenth grade.  (R. 31).  She last worked January 1, 2009 as a cook for the Salvation Army, and she said she left that job because she could no longer do the required heavy lifting.  (R. 31-32).  She had not attempted to get work since then due to her legs and her back.

Buchanan-Adair said that she was injured when she was trying to lift a pot at the Salvation army and became unconscious.  (R. 35).  She said that she woke up at Hillcrest hospital, and the doctor there thought that the problem was her chronic bronchitis.  *Id.*

Buchanan-Adair testified that she experienced a burning sensation in her lower back, with pain shooting down her left leg to her ankle.  (R. 35-36).  Buchanan-Adair said that the burning pain was constant, and she spent most of her time lying down on her couch.  (R. 38-39).  She said the shooting sensation happened most of the time, and her pain was aggravated by standing for extended periods.  (R. 36).  She said that after 45 minutes of standing, there would be a throbbing or pinching sensation in her back and then her left leg.  *Id.*  She thought she could walk for about 30 minutes.  (R. 37).  She thought she could sit for about 30 minutes before she would want to stand.  (R. 40).

Buchanan-Adair had a cane at the hearing, and she testified that a doctor had prescribed it.  (R. 37).  She said that she used it every day.  *Id.*  She said that the doctor had recommended it because she fell often, and she testified that she continued to have a problem with falling.  (R. 37-38).  She thought she fell about once a day.  *Id.*  Her physician had recently authorized a handicapped parking permit due to her COPD and her legs.  (R. 42).

2

Buchanan-Adair said that if she needed to pick up an item from the floor, she would need to scoot it close to something so that she could bend down and pick it up.  (R. 38).  She could not bend down to touch her toes, but she could touch her knees without increasing her pain.  *Id.*

Buchanan-Adair went to the emergency room about twice a year due to her COPD.  (R. 43).  She had difficulty breathing due to her COPD, including shortness of breath.  (R. 43-44).  If she walked very far, she would need to use her inhaler every 45 minutes.  *Id.*

Buchanan-Adair testified that she tried not to do chores at home because it hurt her lower back.  (R. 44).  On a typical day, she would get up at 6:45 a.m., send her children to school, take her medications, sit with her legs propped up, and read.  *Id.*  Her 19-year-old daughter did most of the chores around the house.  *Id.*  Laundry was particularly difficult for Buchanan-Adair to do due to lifting the baskets and bending to put clothes in the washer and dryer.  (R. 44-45).  She thought she could lift five pounds, a bag of potatoes, without difficulty.  (R. 45).  She woke up three or four times during the night due to pain.  *Id.*  She thought she slept about five hours a night, and she napped during the day.  *Id.*  Her medications made her sleepy.  (R. 45-46).  She drove a car, but if she drove very far, she would need to get out and stretch due to pain in her legs.  (R. 46).

Buchanan-Adair testified that she had been going to Family & Children's Services ("F&CS") for mental health issues and they had diagnosed her with bipolar disorder.  (R. 46-47).  She said that she was going once a week because the physicians were still trying to find the right medications for her.  *Id.*  Buchanan-Adair testified that she heard voices at night, and she had conversations with "this certain person."  (R. 47-48).  She experienced depression, and she wanted to be by herself, sometimes in a dark room.  (R. 48).

Buchanan-Adair presented to the emergency room at Tulsa Regional Medical Center ("TRMC") on May 2, 1999, and she was assessed with bronchitis.  (R. 340-45).

Buchanan-Adair presented to the emergency room at TRMC on July 21, 2005 after taking ibuprofen and Xanax in a suicide attempt.  (R. 361-70).  The record said that she was being transferred to the Tulsa Center for Behavioral Health.  (R. 362).

Buchanan-Adair saw Margaret Stripling, D.O. on April 6, 2007.  (R. 230-31).  For assessments, Dr. Stripling circled high blood pressure, anxiety/depression, back/neck pain, and low back pain.  (R. 231).  Prescriptions included Lortab, Flexeril, Xanax, and Wellbutrin.  *Id.* On December 17, 2007, she was seen for high blood pressure and back pain, and her prescriptions included Procardia, Xanax, Flexeril, and Lortab.  (R. 234).  On January 18, 2008, Buchanan-Adair saw Dr. Stripling again.  *Id.*  Her chief complaint was back pain, and her medications were refilled.  *Id.*

Buchanan-Adair presented to the emergency room at Hillcrest Medical Center ("Hillcrest") on January 26, 2008 with acute bronchitis.  (R. 208-29).

At appointments with Dr. Stripling on February 20, 2008 and April 23, 2008, Buchanan-Adair had complaints of back pain, anxiety, and high blood pressure, and her prescriptions were refilled.  (R. 232).  On September 5, 2008, her chief complaint was leg pain, and her medications were refilled.  (R. 233).

On September 30, 2008, Buchanan-Adair presented to the emergency room at Hillcrest after being in a car accident.  (R. 235-43).  She was assessed with lumbar strain and knee strain. (R. 237).  Three x-rays of her lumbar spine were taken, and the reviewing physician noted a "minimal scoliotic deformity" and other minor anomalies.  (R. 242).

4

Buchanan-Adair presented to the emergency room at the Oklahoma State University Medical Center on October 9, 2008.  (R. 387-92).  The physician's impressions were bronchitis and tobacco abuse, and he prescribed an antitussive and an albuterol inhaler.  (R. 388).

Buchanan-Adair was seen again at the Hillcrest emergency room on November 19, 2008 for chest pain.  (R. 244-63).  She was assessed with acute bronchitis.  (R. 246).

Buchanan-Adair presented to the Hillcrest emergency room on March 10, 2009 with abdominal pain, but left without being seen.  (R. 264-66).  She returned on May 6, 2009 and was assessed with acute bronchitis.  (R. 394-412).  She returned on July 13, 2009 and was assessed with chest wall pain and bronchitis.   (R. 413-23).

Buchanan-Adair saw Elka Serrano, M.D. at F&CS on August 28, 2009.  (R. 312-13).  Dr. Serrano's Axis I[2] diagnosis was major depressive disorder, recurrent, severe with psychotic features.  (R. 313).  She assessed Buchanan-Adair's Global Assessment of Functioning ("GAF")[3] as 50.  Id.  She prescribed Celexa, Abilify, and Trazodone.  Id.  Buchanan-Adair presented to F&CS on September 18, 2009 for adjustments to her medications.  (R. 314).

---

[2] The multiaxial system "facilitates comprehensive and systematic evaluation."  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 27 (Text Revision 4th ed. 2000) (hereinafter "DSM IV").

[3] The GAF score represents Axis V of a Multiaxial Assessment system.  See DSM IV at 32-36.  A GAF score is a subjective determination which represents the "clinician's judgment of the individual's overall level of functioning." Id. at 32.  The GAF scale is from 1-100. A GAF score between 21-30 represents "behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment . . . or inability to function in almost all areas." Id. at 34.  A score between 31-40 indicates "some impairment in reality testing or communication . . . or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." Id.  A GAF score of 41-50 reflects "serious symptoms . . . or any serious impairment in social, occupational, or school functioning." Id.

Buchanan-Adair saw Aletha C. Oglesby, M.D. at Utica Park Clinic South on January 5, 2010 with left leg pain that she said had started seven months earlier.  (R. 316-17).  She returned on January 22, 2010, and was prescribed Flexeril and Xanax.  (R. 318-19).  At a well woman examination on February 12, 2010, assessments included fatigue, myalgias, and back pain.  (R. 320-21).  On February 19, 2010, Buchanan-Adair was assessed with acute bronchitis, and Dr. Oglesby wrote "(?COPD)" next to that assessment.  (R. 327-28).  Buchanan-Adair returned to Dr. Oglesby on March 4, 2010, with a chief complaint of left leg pain.  (R. 330-31).  Dr. Oglesby's assessments included "left leg pain, consider lumbar radiculitis," and she ordered an MRI of the lumbar spine.  (R. 331).  On June 18, 2010, Dr. Oglesby assessed chronic sciatic leg pain and "possible disc disease per previous XR."  (R. 397).

Buchanan-Adair was seen at the Hillcrest emergency room on June 25, 2010 with a complaint of shortness of breath.  (R. 394-96).  Assessments were acute exacerbation of COPD; hypertension; depression and anxiety; chronic back pain; and nausea and vomiting.  (R. 395).

Buchanan-Adair returned to Dr. Oglesby on June 28, 2010 and told her about the June 25 episode at the Hillcrest emergency room.  (R. 399-400).  Dr. Oglesby assessed "acute dyspnea [with] hypoxia - etiology unclear; was attributed to COPD but I don't have documentation that this is confirmed."  (R. 400).  She also assessed chronic leg pain with a note to rule out radiculopathy, and she renewed Buchanan-Adair's Lortab prescription.  *Id.*  A spirometry report was normal.  (R. 401).  A lumbar spine MRI on June 29, 2010 was normal.  (R. 402).

Buchanan-Adair presented to the Hillcrest emergency room on September 27, 2010, but left without being seen.  (R. 493).  Buchanan-Adair presented to the Hillcrest emergency room on December 20, 2010 due to a "[r]ecent Xanax overdose."  (R. 494-95, 505-13).  Axis I diagnoses were depression, not otherwise specified; panic disorder; cannabis abuse; and pathological

gambling.  (R. 505).  Her GAF was assessed as 35.  *Id.*  She returned on January 17, 2011 with lacerations from falling out of bed.  (R. 496-504).

A lumbar spine MRI on July 8, 2011 was normal.  (R. 487).

Buchanan-Adair was examined by agency consultant Joel Justin Hopper, D.O. on May 18, 2009.  (R. 267-73).  On examination, Dr. Hopper said that Buchanan-Adair moved about the examination room easily and had full range of motion of her spine.  (R. 268).  Straight leg raising was negative, but Buchanan-Adair had discomfort in "the posterior lower extremities with extremes of supine [straight leg raising] bilaterally."  *Id.*  Dr. Hopper noted a mild left lumbar scoliotic curve.  *Id.*  Buchanan-Adair's toe and heel walking was normal, and Dr. Hopper found that her gait was stable at an appropriate speed without any assistive devices.  *Id.*  His assessments were hypertension under poor control; asthma; depression; anxiety; and chronic back pain with a history of mild left lumbar scoliosis.  *Id.*

Nonexamining agency consultant Mary Lanette Rees, M.D., completed a Physical Residual Functional Capacity Assessment on June 15, 2009.  (R. 297-304).  For exertional limitations, Dr. Rees found that Buchanan-Adair could perform medium work.  (R. 298-99).  In spaces for narrative comments, Dr. Rees reviewed Buchanan-Adair's treating history, including October 2008 x-rays that showed only minimal abnormalities.  (R. 298-99, 302).  Dr. Rees briefly summarized Dr. Hopper's consultative examination.  *Id.*  Dr. Rees also reviewed Buchanan-Adair's reported activities of daily living.  (R. 302).  Dr. Rees found that Buchanan-Adair had no postural, manipulative, visual, communicative, or environmental limitations.  (R. 299-304).

Michael D. Morgan, Psy. D., an agency consultant, completed a mental status examination of Buchanan-Adair on June 4, 2009.  (R. 274-78).  Dr. Morgan said that Buchanan-Adair was limping, and she "evinced psychomotor retardation and appeared to be suffering from a hangover."  (R. 274).  Dr. Morgan said that Buchanan-Adair fell asleep several times during the interview.  (R. 275).  He said that her motivation appeared to be somewhat reduced, and her mood was moderately depressed.  *Id.*  He said that Buchanan-Adair attempted to exaggerate the severity of her symptoms by answering "nothing" to a question regarding what she did during the day.  *Id.*  He then stated the following:

> It is more likely that her regular activities include, at a minimum, include having regular contact with family and others in and outside the home environment, watching TV, maintaining personal hygiene, housekeeping tasks, going to doctor appointments, drinking beer and smoking marijuana, and spending time with and caring for her 3 daughters ages 18, 17, and 15.

*Id.*  Dr. Morgan said that Buchanan-Adair said that she did not drive and did not have a driver's license.  *Id.*  He said that she should be assigned a payee due to "active substance dependence."  *Id.*  He said that Buchanan-Adair reported current use of marijuana.  (R. 276).  Dr. Morgan said that use of marijuana while taking psychotropic medication placed Buchanan-Adair in noncompliance with her treatment.  *Id.*  Dr. Morgan said that Buchanan-Adair's memory and concentration appeared to be within normal limits except when she drifted off to sleep.  *Id.*  He said that Buchanan-Adair presented with symptoms consistent with a depressive disorder "that most likely stems from her ongoing use of alcohol and cannabis."  *Id.*  His Axis I diagnoses were alcohol dependence with physiological dependence; cannabis dependence with physiological dependence; noncompliance with treatment; and depressive disorder not otherwise specified.  (R. 277).  He assessed Buchanan-Adair's GAF as 66-70.  *Id.*

Agency nonexamining consultant Burnard Pearce, Ph.D. completed a Psychiatric Review Technique Form and a Mental Residual Functional Capacity Assessment on June 11, 2009.  (R. 279-92).  For Listing 12.04, Dr. Pearce noted Buchanan-Adair's mood disturbance with depressive syndrome and depressive disorder, not otherwise specified.  (R. 282).  For Listing 12.09, Dr. Pearce noted Buchanan-Adair's alcohol and cannabis dependence with physiological dependence.  (R. 287).  For the "Paragraph B Criteria,"[4] Dr. Pearce found that Buchanan-Adair had moderate restriction of activities of daily living, moderate difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace, with no episodes of decompensation.  (R. 289).  In the "Consultant's Notes" portion of the form, Dr. Pearce summarized Dr. Morgan's report in some detail.  (R. 291).

In Dr. Pearce's Mental Residual Functional Capacity Assessment, he found that Buchanan-Adair was moderately limited in her ability to understand, remember, and carry out detailed instructions.  (R. 293).  Dr. Pearce also found Buchanan-Adair to be moderately limited in her ability to interact appropriately with the general public.  (R. 294).  He found no other significant limitations.  (R. 293-94).  Dr. Pearce found that Buchanan-Adair could understand and perform simple and some complex tasks with routine supervision.  (R. 295).  He said that she could interact appropriately with others at a superficial level and she could adapt to a work situation.  *Id.*

---

[4] There are broad categories known as  the "Paragraph B Criteria" of the Listing of Impairments used to assess the severity of a mental impairment.  The four categories are (1) restriction of activities of daily living, (2) difficulties in maintaining social functioning, (3) difficulties in maintaining concentration, persistence or pace, and (4) repeated episodes of decompensation, each of extended duration.  Social Security Ruling ("SSR") 96-8p; 20 C.F.R. Part 404 Subpt P, App. 1 ("Listings") § 12.00C.  *See also Carpenter v. Astrue*, 537 F.3d 1264, 1268-69 (10th Cir. 2008).

## Procedural History

Buchanan-Adair filed applications in March 2009 for Title II disability insurance benefits and for Title XVI supplemental security income benefits under the Social Security Act, 42 U.S.C. §§ 401 *et seq.*  (R. 126-32).  Buchanan-Adair alleged onset of disability as of January 1, 2009. (R. 129).  The applications were denied initially and on reconsideration.  (R. 72-80, 84-88).  A hearing before ALJ Charles Headrick was held on April 19, 2010.  (R. 25-59).  By decision dated May 11, 2010, the ALJ found that Buchanan-Adair was not disabled.  (R. 12-19).  On January 27, 2012, the Appeals Council denied review of the ALJ's findings.  (R. 1-5).  Thus, the decision of the ALJ represents a final decision for purposes of this appeal.  20 C.F.R. §§ 404.981, 416.1481.

## Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A).  A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim.  20 C.F.R. § 404.1520.[5]  *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988)

---

[5] Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510.  Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities.  *See* 20 C.F.R. § 404.1520(c).  If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied.  At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings").  A claimant

(detailing steps).  "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary."  *Id.*

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g).  This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied.  *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion.  *Id.*  The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'"  *Id.*, (*quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994)).  The court "may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner.  *Hamlin,* 365 F.3d at 1214 (quotation omitted).

## Decision of the Administrative Law Judge

The ALJ found that Buchanan-Adair met insured status requirements through the date of his decision.  (R. 14).  At Step One, the ALJ found that Buchanan-Adair had not engaged in substantial gainful activity since her alleged onset date of January 1, 2009.  *Id.*  At Step Two, the

---

suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry.  If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work.  If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform.  *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001).  Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

ALJ found that Buchanan-Adair had severe impairments of minimal left scoliosis and a depressive disorder. *Id.*  At Step Three, the ALJ found that Buchanan-Adair's impairments did not meet any Listing.  (R. 15).

The ALJ determined that Buchanan-Adair had the RFC to perform medium work "except she can perform only simple work tasks."  (R. 16).  At Step Four, the ALJ found that Buchanan-Adair could perform her past relevant work.  (R. 17).  As an alternative finding, at Step Five, the ALJ found that there were jobs in significant numbers in the national economy that Buchanan-Adair could perform, considering her age, education, work experience, and RFC.  (R. 18).  Thus, the ALJ found that Buchanan-Adair was not disabled from January 1, 2009 through the date of the decision.  (R. 19).

**Review**

Buchanan-Adair argues that she was denied due process and "the right to a full and fair hearing."  Plaintiff's Opening Brief, Dkt. #20, p. 3.  She also argues that the ALJ's decision was flawed at Steps Four and Five because the ALJ did not properly evaluate her past relevant work and did not include all impairments in the hypothetical and RFC.  Finally, Buchanan-Adair argues that the ALJ's credibility assessment was not adequate.  Regarding the issues raised by Buchanan-Adair, the undersigned finds that the ALJ's decision is supported by substantial evidence and complies with legal requirements.  Therefore, the ALJ's decision is affirmed.

**Due Process Issues**

Social security hearings are subject to procedural due process considerations.  *Yount v. Barnhart* , 416 F.3d 1233, 1235 (10th Cir. 2005); *Allison v. Heckler,* 711 F.2d 145, 147 (10th Cir.1983) (citing *Richardson v. Perales,* 402 U.S. 389, 401-02, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)).  Buchanan-Adair's due process complaint is based on the report of Dr. Morgan, but her

12

actual argument is not stated with clarity.  Plaintiff's Opening Brief, Dkt. #20, pp. 3-6.

Buchanan-Adair objects to the language in Dr. Morgan's report that the undersigned quoted

above which states that her activities of daily living "more likely" consisted of listed items,

including drinking beer and smoking marijuana.  Buchanan-Adair states that the list of activities

Dr. Morgan included is speculation and it poisoned his own analysis and the analysis of the

physical and mental nonexamining consultants.

Buchanan-Adair objects only to the inclusion of "drinking beer and smoking marijuana"

and does not state that the other activities listed by Dr. Morgan were speculative or erroneous.

Dr. Morgan did not refer to alcohol and marijuana only in the sentence to which Buchanan-Adair

objects, but he included numerous statements throughout his report reflecting Buchanan-Adair's

use of alcohol and marijuana and his conclusion that Buchanan-Adair had current issues of

alcohol and marijuana dependence.  (R. 274-78).

At the hearing before the ALJ, Buchanan-Adair denied having told Dr. Morgan that she

had current issues, but that she reported only past use of alcohol and marijuana.  (33-34).  Her

actual testimony on this point, however, was not clear:

> Q.  Felicia, before we get started, you heard my opening comment.  Do you
> remember the examination of Dr. Michael Morgan - the psychological that Social
> Security had sent you to?
>
> A.  Yes, sir.
>
> Q.  Felicia, is there or was there a drug or an alcohol problem?
>
> A.  No, sir.
>
> Q.  Okay, why would he reference?
>
> A.  Well, he asked me in the future did I have - I did drugs - I told him yes.
>
> Q.  So there was - there was a drug problem.

A.  Yes, right, in the future.  I mean, in the past there was.

(R. 33-34).  When asked when she last used marijuana, she said "[a]pproximately, probably

about - over five years, a year ago.  Probably about five years ago."  (R. 34).  She later testified

that she had begun hearing voices the year before the hearing, and her counsel asked her if she

had stopped smoking marijuana five years before she began to hear voices.  She answered:

"Well, no I was thinking it's probably about - I stopped using it, I started back, and I stopped, and

then I started back I think in 2008, and then I started hearing my voices in 2009."  (R. 35).  The

ALJ followed up on the timing of her use of marijuana:

> Q.  Okay, and if I understood your testimony here just a moment ago, you said you hadn't used drugs in about five years, and then in a moment, you talked about using drugs two or three years ago.
>
> A.  Yeah, I stopped, and then I used, and I stopped.
>
> Q.  Okay, so you didn't stop five years ago?
>
> A.  Right.

(R. 51).  She then testified again that she didn't say anything to Dr. Morgan that could have led

him to believe that she had a current drug or alcohol problem.  *Id.*

Buchanan-Adair attempts to argue that Dr. Morgan's report is "entirely at odds" with the

other medical evidence.  The physicians at Hillcrest on December 20, 2010, however, included

"cannabis abuse" in their Axis I diagnoses.  (R. 494-95, 505-13).  Moreover, the decision of

whether to accept Buchanan-Adair's testimony or to accept the report of Dr. Morgan was a

question of fact that was before the ALJ.  Buchanan-Adair's argument is that the Court should

overrule the report of Dr. Morgan and act as a fact-finder in the first instance.  Such a role is not

within the statutory mandate for this Court.  42 U.S.C. § 405(g) ("The findings of the

Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be

conclusive"); *Allen v. Barnhart,* 357 F.3d 1140, 1143-45 (10th Cir. 2004) (court acts within confines of its administrative review authority).

There was no due process violation in the way that the ALJ handled the issue of Dr. Morgan's report.

**Step Four and Five Issues**

Buchanan-Adair says that the ALJ erred at Steps Four and Five because he failed to properly evaluate her past relevant work and he failed to include all of her impairments in his RFC determination and in his hypothetical to the vocational expert (the "VE"). Her arguments are not persuasive.

Buchanan-Adair first argues that the ALJ failed to determine the precise physical and mental demands of her past relevant work, *citing Winfrey v. Chater*, 92 F.3d 1017, 1024 (10th Cir. 1996). She says that the ALJ did not make any inquiry about the demands when he questioned the VE. The undersigned, however, finds that the ALJ did inquire regarding Buchanan-Adair's past work. (R. 55). Then he asked a hypothetical, using the Physical Residual Functional Capacity Assessment of Dr. Rees, and the Mental Residual Functional Capacity Assessment of Dr. Pearce. (R. 55-56). The ALJ asked if the hypothetical individual could return to Buchanan-Adair's past work, and the VE testified that she could return to that work as normally done, but not as Buchanan-Adair had performed it. *Id.*

In her Step Four argument, Buchanan-Adair asserts that the ALJ did not inquire with enough detail regarding the demands of her past relevant work, but she does not explain what details were missing. She says that the ALJ's limitation to "simple work" precludes the job of cook because it is skilled with an SVP of 6, but the VE specifically testified that someone with Buchanan-Adair's RFC could return to that work. Regarding the job of housekeeper, she resorts

to adding limitations that the ALJ did not find.  She says that she could not perform that job because she could not lift 25 to 50 pounds, which is one part of performing medium work, and because she could not be exposed to fumes and odors.  The ALJ, however, found that Buchanan-Adair could perform medium work and he found no environmental limitation.

Buchanan-Adair also argues, inexplicably, that the ALJ and the VE overlooked her past work with the post office.  The undersigned finds that failure to inquire into even more past relevant work is hardly reversible error at Step Four.  The question is whether the ALJ adequately inquired into the physical and mental demands of any past relevant work at Step Four and whether the VE's testimony served as substantial evidence supporting the ALJ's Step Four finding that the claimant could return to that past relevant work.  While Buchanan-Adair repeatedly argues that the ALJ, and the VE, did not address the demands of her past relevant work in sufficient detail, the undersigned finds that the inquiry, and the VE's testimony, was sufficient.  No reversible error occurred at Step Four.

While the Court finds the Step Four finding to be valid, and therefore the five-step analysis stops here, in the interest of judicial economy the Court will also review the ALJ's alternative finding at Step Five.  Some of Buchanan-Adair's arguments at Step Five are essentially arguments regarding her RFC.  First, she argues that the ALJ did not consider the GAF score of 50 assigned to her on August 28, 2009 by Dr. Serrano.  She argues that this GAF score was the opinion of a treating physician.  The Tenth Circuit has rejected similar arguments that an ALJ erred by failing to mention GAF scores.  *Butler v. Astrue*, 412 Fed. Appx. 144, 145-47 (10th Cir. 2011) (unpublished).  In *Butler*, mental health counselors assigned GAF scores ranging from 44 to 46, while a consultative examiner gave the claimant a GAF of 70.  The Tenth Circuit affirmed the ALJ's decision, finding that the ALJ had considered all of the evidence, even

though he had not specifically included the lower GAF scores in his discussion. *Id.*  In the present case, the ALJ mentioned that Buchanan-Adair had sought treatment at F&CS in August 2009, and it is therefore clear that he considered that evidence.  (R. 17).  Moreover, he specifically noted that there was no evidence that Buchanan-Adair returned to F&CS after September 2009.  The GAF score assessed by Dr. Serrano has a greatly reduced importance as a treating physician opinion when the evidence appears to show that Dr. Serrano only saw Buchanan-Adair on one occasion. *Doyal v. Barnhart*, 331 F.3d 758, 762-63 (10th Cir. 2003) *quoting* 20 C.F.R. 416.927(d)(2)(i)-(ii) (to be entitled to special weight as that of a "treating source," physician would have had to have "seen the claimant 'a number of times and long enough to have obtained  a longitudinal picture of [the claimant's] impairment'").  Under these circumstances, there was no reversible error related to the GAF score of 50.

Next, Buchanan-Adair argues that the ALJ was required to include pain, depression, and COPD as limitations in determining her RFC.  The difficulty is that the ALJ did, indeed, discuss all of these, and he did include limitations that were supported by substantial evidence.  Regarding pain, the ALJ did not have to accept all of Buchanan-Adair's statements regarding its limiting effects as true.  Further, the ALJ relied upon the assessment of Dr. Rees, who specifically stated that pain did not further limit her assessment.  (R. 299).

Regarding depression, the ALJ did include the limitation to simple work tasks, and his RFC is supported by substantial evidence in the form of Dr. Pearce's assessment.  Buchanan-Adair makes fleeting references to the ALJ's failure to include any limitations regarding her ability to interact appropriately with the public, co-workers, or supervisors.  These one-sentence assertions are perfunctory and deprive the Court of the ability to meaningfully analyze them.

They are therefore waived.  *Wall v. Astrue*, 561 F.3d 1048, 1066 (10th Cir. 2009).[6]  Even without

a finding of waiver, these truncated arguments are not persuasive.  The ALJ's hypothetical to the

VE made specific reference to Dr. Pearce's assessment, and the VE testified that there were many

jobs that an individual with those limitations could perform.  (R. 55-57).  Thus, the VE testified

that there were jobs that could be performed by an individual with even more limitations than

those found by the ALJ in his RFC determination.  There was no reversible error in the ALJ's

Step Five finding as it relates to Buchanan-Adair's mental limitations.

Buchanan-Adair argues that the ALJ should have included environmental limitations

relating to her COPD, even though he found at Step Two that her "alleged COPD is mild or

nonexistent, and would have only a minimal [effect] on her ability to perform substantial gainful

activity and thus, is nonsevere."  (R. 15).  In support of his finding at Step Two, the ALJ cited to

the February 19, 2010 office visit with Dr. Oglesby at which time Buchanan-Adair was assessed

with acute bronchitis, and Dr. Oglesby wrote "(?COPD)" next to it.  *Id.*  Dr. Rees did not include

any environmental limitations in her assessment.  (R. 301).  Thus, the ALJ's decision not to

include environmental limitations in his RFC determination was supported by substantial

evidence.

The ALJ's Step Four and Step Five findings were supported by substantial evidence and

were in compliance with legal requirements.

---

[6] Buchanan-Adair also makes a one-sentence argument relating to postural limitations, and that argument, too, is waived.  However, Dr. Rees specifically found no postural limitations, and therefore the ALJ's RFC determination containing no postural limitations is supported by substantial evidence.

**Credibility Assessment**

Credibility determinations by the trier of fact are given great deference. *Hamilton v.*

*Secretary of Health & Human Services,* 961 F.2d 1495, 1499 (10th Cir. 1992).

> The ALJ enjoys an institutional advantage in making [credibility determinations].
> Not only does an ALJ see far more social security cases than do appellate judges,
> [the ALJ] is uniquely able to observe the demeanor and gauge the physical
> abilities of the claimant in a direct and unmediated fashion.

*White v. Barnhart,* 287 F.3d 903, 910 (10th Cir. 2002).  In evaluating credibility, an ALJ must

give specific reasons that are closely linked to substantial evidence. *See Kepler v. Chater*, 68

F.3d 387, 391 (10th Cir. 1995); Social Security Ruling 96-7p, 1996 WL 374186.  "[C]ommon

sense, not technical perfection, is [the] guide" of a reviewing court. *Keyes-Zachary v. Astrue*,

695 F.3d 1156, 1167 (10th Cir. 2012).

After an introductory sentence,[7] the ALJ first discussed Buchanan-Adair's back pain,

contrasting it with the objective medical evidence of x-rays and physical examination.  (R. 16).

Inconsistencies of the claimant's complaints compared to the objective medical evidence is a

legitimate consideration.  *See* 20 C.F.R. § 404.1529(c)(4) ("we will evaluate your statements in

relation to the objective medical evidence").  The ALJ then noted that Buchanan-Adair had not

sought treatment for her back pain from September 2008 until January 2010.  (R. 16-17).  The

---

[7] Buchanan-Adair faults the introductory language used by the ALJ: "After careful
consideration of the evidence, the undersigned finds that the claimant's medically determinable
impairments could reasonably be expected to cause the alleged symptoms; however, the
claimant's statements concerning the intensity, persistence and limiting effects of these
symptoms are not credible to the extent that they are inconsistent with the above residual
functional capacity assessment."  (R. 16).  While this language might have been "meaningless
boilerplate," it was merely an introduction to the ALJ's analysis and was not harmful.  *See
Keyes-Zachary*, 695 F.3d at 1170 (use of boilerplate language in a credibility assessment is
problematic only "in the absence of a more thorough analysis") (further quotations omitted).
Buchanan-Adair's counsel "well knows" that this argument is unavailing.  *Boehm v. Astrue*, 2013
WL 541067 n.3 (10th Cir.) (unpublished).

extent of the claimant's efforts to obtain relief is a legitimate specific reason for a finding of credibility. *Kepler*, 68 F.3d at 391; *Hagar v. Barnhart*, 102 Fed. Appx. 146, 148 (10th Cir. 2004) (unpublished) (ALJ was entitled to consider that, if the claimant's symptoms were as debilitating as asserted, she would have sought additional treatment).

The ALJ then made a similar assessment of Buchanan-Adair's claims regarding depression and anxiety. (R. 17). He noted that she had been prescribed Xanax in December 2007, and there was then no mention of anxiety or depression until the consultative examination in June 2009. *Id.* He noted that Buchanan-Adair went to F&CS for mental health treatment in August and September 2009, but there was no evidence that she returned after that time. *Id.* The ALJ then noted that Dr. Morgan believed that Buchanan-Adair was exaggerating her symptoms, and the ALJ noted that Buchanan-Adair testified that she had not said some of the things that were reflected in Dr. Morgan's report. *Id.*

The ALJ noted that while Buchanan-Adair testified that she had been prescribed a cane, there was no evidence that a physician prescribed one. *Id.*

All of these were legitimate and specific reasons for finding Buchanan-Adair less than fully credible, and these reasons were closely linked to substantial evidence. Faced with this credibility assessment, Buchanan-Adair first makes several one-sentence arguments. As was true with Buchanan-Adair's other arguments, these undeveloped assertions are perfunctory and deprive the Court of the ability to meaningfully analyze them. They are therefore waived. *Wall*, 561 F.3d at 1066.

Even without a finding of waiver, Buchanan-Adair's arguments are not persuasive. She asserts that the ALJ could not ignore the VE's testimony that if her claims were taken as credible, she could not work. Plaintiff's Opening Brief, Dkt. #20, pp. 10-11. Given the supported finding

of the ALJ that Buchanan-Adair was not fully credible, the VE's testimony regarding the consequences of a finding that she was fully credible is obviously not relevant. *See Barrett v. Astrue*, 340 Fed. Appx. 481, 488 (10th Cir. 2009) (unpublished) (testimony of VE regarding limitations that were not ultimately included in the ALJ's RFC was not relevant); *Roulston v. Shalala*, 46 F.3d 1152 *1 (10th Cir. 1995) (unpublished) (ALJ did not ignore unfavorable testimony that was elicited by claimant's attorney and based on subjective complaints that the ALJ ultimately found not credible).

Buchanan-Adair argues that the ALJ did not specify which parts of her testimony he accepted as true. The Tenth Circuit recently rejected this identical argument. *Jimison ex rel. Sims v. Colvin*, 2013 WL 1150290 at *6 (10th Cir.) (unpublished). The court in *Jimison* found that it was clear enough which portions the ALJ considered to be true or untrue based on the decision as a whole. *Id.* The same is true here.

*Jimison* also addressed Buchanan-Adair's next argument that the ALJ's decision was invalid because he determined her RFC determination and then his introductory language to his credibility assessment said that he found her not credible to the extent that her claims were not consistent with that RFC. Plaintiff's Opening Brief, Dkt. #20, pp. 11-12. The Tenth Circuit said that the order of consideration in the ALJ's decision did not warrant reversal: "[A]lthough the ALJ's opinion recited his RFC finding before discussing credibility, there is no indication that the ALJ did not factor in [the claimant's] credibility." *Jimison*, 2013 WL 1150290 at *6.

Buchanan-Adair attacks other language of the ALJ as boilerplate, but boilerplate is "problematic only when it appears 'in the absence of a more thorough analysis.'" *Keyes–Zachary*, 695 F.3d at 1170 (quoting *Hardman v. Barnhart*, 362 F.3d 676, 679 (10th Cir. 2004)). In Buchanan-Adair's case, in spite of the ALJ's use of some boilerplate provisions, the

Court is "persuaded that the ALJ's credibility determination is closely and affirmatively linked to substantial evidence." *Miller v. Astrue*, 496 Fed. Appx. 853, 857 (10th Cir. 2012) (unpublished).

Buchanan-Adair argues that the ALJ failed to sufficiently discuss the factors delineated in Social Security Ruling 96-7p, 1996 WL 374186.  Buchanan-Adair complains that the ALJ should have discussed her activities of daily living and her medications.  The Court finds that this is not reversible error as illustrated by a recent unpublished case.  *Polson v. Astrue*, 2013 WL 238849 *1-2 (10th Cir.) (unpublished).  The court in *Polson* explained the law of our Circuit since 2000 that "[s]o long as the ALJ 'sets forth the specific evidence he relies on in evaluating the claimant's credibility,' he need not make a 'formalistic factor-by-factor recitation of the evidence.'"  *Id.*, *quoting Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000).  The ALJ's credibility evaluation in *Polson* is similar to the ALJ's analysis in Buchanan-Adair's case.  The Tenth Circuit approved the credibility evaluation because the claimant had failed to seek treatment for a long period of time and her physicians had not placed any functional limitations on her that precluded sedentary work.  *Polson*, 2013 WL 238849 at *2.  The ALJ found the claimant had restricted activities of daily living, but those had not been placed on her by medical providers.  *Id.*

Buchanan-Adair asserts that the ALJ was required to discuss the observations of the Social Security Administration clerk that she had difficulty standing and walking, walked with a cane, and was slow to get up after the interview.  Plaintiff's Opening Brief, Dkt. #20, p. 14.  The undersigned rejects this assertion, for which Buchanan-Adair cites to two District of Kansas decisions.  The ALJ's omission of these minor facts does not require remand.  *See Korum v. Astrue*, 352 Fed. Appx. 250, 253-54 (10th Cir. 2009) (unpublished) (ALJ's opinion was thorough, and evidence not mentioned by the ALJ was not of such quality as to require

discussion); *Shubargo v. Barnhart*, 161 Fed. Appx. 748, 755 (10th Cir. 2005) (unpublished) (agency clerk's observations "were not significantly probative and the ALJ was not required to discuss why he did not rely on them").

Buchanan-Adair also asserts that the ALJ failed to discuss her prescription medications, and it is true that the ALJ only mentioned some of her medications. She also says that the ALJ failed to discuss her asserted side effect that her medications make her sleepy. The ALJ, in summarizing Buchanan-Adair's testimony, said that she took her medication and took naps, but he did not specifically say that she said her medications made her sleepy. (R. 16). On this record, however, the ALJ's failure to specifically discuss her medications and asserted side effects is not reversible error. In support of her argument, Buchanan-Adair cites to *Sitsler v. Astrue*, 410 Fed. Appx. 112, 117 (10th Cir. 2011). The facts of *Sitsler*, however, are in contrast to those of the present case. In *Sitsler*, the Tenth Circuit said that it was error for the ALJ to fail to note his pain medication prescriptions. The key to the court's reasoning, however, was that the record was "replete with prescriptions and refills for pain medication, including narcotics." *Id.* The records of Buchanan-Adair's treatment do not show the kind of consistent efforts on her part to obtain relief from pain that was an essential part of the court's reasoning in *Sitsler*. Here, as the ALJ noted, Buchanan-Adair's efforts to seek treatment were sporadic, and there were large periods of time with no treatment for pain. (R. 16-17). On this record, the ALJ's failure to thoroughly discuss Buchanan-Adair's prescription medications and their purported side effects was not reversible error. *See Keyes-Zachary*, 695 F.3d at 1173 (ALJ's failure to mention alleged side effect was harmless error given circumstances of case).

Finally, after having argued that the report of Dr. Morgan was tainted by speculation, Buchanan-Adair argues that his report supports her claims regarding her side effects. Plaintiff's

Opening Brief, Dkt. #20, pp. 14-15.  She says that the ALJ "ignored" that she fell asleep several times during the evaluation with Dr. Morgan, and she says that her sleepiness during the session was "objective confirmation of [her] credibility."  *Id.*  Because Dr. Morgan's report indicates that he thought Buchanan-Adair was suffering from a hangover, her sleepiness during her session with him is hardly a point in favor of her credibility.  (R. 274).  This argument has no merit.

"In sum, the ALJ closely and affirmatively linked his adverse credibility finding to substantial evidence in the record and did not employ an incorrect legal standard.  'Our precedents do not require more, and our limited scope of review precludes us from reweighing the evidence or substituting our judgment for that of the agency.'"  *Zaricor-Ritchie v. Astrue*, 452 Fed. Appx. 817, 824, *citing Wall*, 561 F.3d at 1070 (further quotations omitted).

### Conclusion

The decision of the Commissioner is supported by substantial evidence and the correct legal standards were applied.  The decision is **AFFIRMED**.

Dated this 10th day of May 2013.

Paul J. Cleary
United States Magistrate Judge